UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| SHANNON FRANKLIN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 6:24-cv-00173-GFVT |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| CSX TRANSPORTATION, INC., *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court upon a Motion to Dismiss filed by Defendant CSX Transportation, Inc. [R. 11.]  This case arises out of a train derailment, the subsequent cleanup, and the alleged consequences of the derailment and cleanup. CSX now advances a number of theories as to why the Plaintiffs' claims should be dismissed.  For the reasons that follow, the Defendant's Motion to Dismiss will be **GRANTED in part** and **DENIED in part.**

**I**

On November 22, 2023, a train derailed in Rockcastle County, Kentucky.  [R. 1-2 at 2.] A number of train cars operated by CSX were part of that derailment—two of them contained molten sulfur, three contained magnesium hydroxide, and an empty container had previously held methanol.  *Id*. at 3.  CSX initially told first responders "that there was nothing to worry about, as the cars were carrying substances that were food grade."  *Id*. at 6.  Alas that was untrue, and the Plaintiffs and other emergency responders worked through the night to extinguish flames caused by the molten sulfur.  *Id*.  The Plaintiffs were unable to evacuate the area as local residents were instructed to do.  *Id*.  at 7.  During that time the Plaintiffs were exposed to sulfur

dioxide pouring into the atmosphere. *Id*. at 6. Sulfur dioxide is a colorless gas with a pungent odor and exposure can cause: irritation of mucous membranes, including the throat, esophagus, and eyes; reflex cough; an increase in respiratory rate associated with decrease in depth of respiration; a decrease in nasal mucus flow; variable effects on tracheal and bronchial mucus flow; a decrease in forced expiratory volume and flow; a decrease in airway conductance; and an increase in airway resistance. *Id*.

As a result of this exposure, the Plaintiffs – uniformly first responders who worked to extinguish the blaze following the derailment – all suffer various physical ailments such as sore throats, trouble breathing, headaches, and respiratory infections. *Id*. at 11-13. They have now brought claims demanding medical monitoring due to their increased risks of developing serious diseases, alleging strict liability on the part of CSX due to ultrahazardous activities, alleging negligence on the part of CSX, and alleging willful and wanton conduct on the part of CSX. *Id*. at 14-20. The Plaintiffs predicate these allegations on alleged failures by CSX to inspect, train, monitor, operate, transport properly, or otherwise have appropriate policies and procedures that would prevent what happened.[1]

CSX seeks to dismiss these claims and presents a number of arguments to that effect. First, CSX argues that the Firefighter's Rule bars the plaintiffs from recovery as they incurred their injuries while acting as first responders. Second, CSX argues that medical monitoring claims have no basis in Kentucky law. Third, CSX offers a number of reasons as to why the

---

[1] The Court notes here that the Plaintiffs expand on the facts in their Response to CSX's Motion to Dismiss. As CSX points out in its Reply, "Plaintiffs cannot . . . amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020); *see also Star Ins. Co. v. Smith*, 2015 WL 3649896, at *2 (E.D. Ky. June 11, 2015) ("Facts set forth in a response to a motion to dismiss cannot amend a defective complaint."). Thus the facts are described here as they are set forth in the Complaint itself.

Plaintiffs have not substantively pleaded viable claims.  Finally, CSX argues that the Plaintiffs' "effort to regulate rail transportation" under state tort law is preempted by multiple federal statutes.  The matter having been fully briefed is now ripe for review.

## II

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The plaintiff must provide grounds for his requested relief that are more than mere labels and conclusions.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of cause of action will not do."  *Id.*

To review a Rule 12(b)(6) motion, courts construe the complaint "in the light most favorable to the plaintiff" and make "all inferences in favor of the plaintiff."  *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)).  The complaint must enable a court to draw a "reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  To be plausible, a claim need not be probable, but the complaint must show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that pleads facts that are consistent with but not demonstrative of the defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).  The moving party bears the burden of persuading a trial court that the plaintiff fails to state a claim.  *Bangura v. Hansen*, 434 F.3d 487, 498 (6th Cir. 2006).

### A

CSX first contends that the Plaintiffs' claims are barred by the Firefighter's Rule. The

Firefighter's Rule is a "judicially created 'public policy' exception to the liability for negligence which might otherwise exist. *Sallee v. GTE South, Inc.*, 839 S.W.2d 277, 278 (Ky. 1992) (citing *Hawkins v. Sunmark Indus., Inc.,* Ky., 727 S.W.2d 397, 399 (1986)). As formulated in Kentucky, the Firefighter's Rule has three prongs:

> 1) The purpose of the policy is to encourage owners and occupiers, and others similarly situated, in a situation where it is important to themselves and to the general public to call a public protection agency, and to do so free from any concern that by so doing they may encounter legal liability based on their negligence in creating the risk.
> 2) The policy bars public employees (firefighters, police officers, and the like) who, as an incident of their occupation, come to a given location to engage a specific risk; *and*
> 3) The policy extends only to that risk.

*Sallee*, 839 S.W.2d at 279. In CSX's view, all elements are readily met. CSX is an occupier of the relevant place (the tracks and surrounding area) or at least "similarly situated" to an owner or occupier, the Plaintiffs are emergency responders,[2] and the injuries alleged relate directly to the specific risk the Plaintiffs were called to engage. [R. 11-1 at 12-15.] By contrast, the Plaintiffs argue that they did not respond to property owned by CSX, that the danger they encountered (chemical fires) is not part of the risks of their job, and that *Fletcher v. Ill. Cent. Gulf R.R. Co.*, 679 S.W.2d 240 (Ky. Ct. App. 1984) – a case extremely similar to the one at hand – is no longer the most applicable law. [R. 16-1 at 11-13.] Despite the mixed characterizations of the Plaintiffs and their activities in the aftermath of the derailment, there is no question that they satisfy the second prong as public employees (be they firefighters or police officers).

As to the first prong, CSX was an occupier, or "similarly situated" to an occupier, of the

---

[2] The occupation of the Plaintiffs is not clear in the Complaint, which merely describes them as "emergency responders" who "worked through the night to extinguish the fire." [R. 1-2 at 6.] The Plaintiffs' Response makes clear that they are all law enforcement personnel. [R. 16-1 at 9.] As explained below, this distinction matters little for Kentucky's version of the Firefighter's Rule and does not impact the outcome of this case.

4

relevant area.  In *Sallee*, the Kentucky Supreme Court noted that the Rule is not strictly limited to owners or occupiers but is also intended to cover "others who need to be protected so they will call upon the appropriate public protection agency." *Sallee*, 839 S.W.2d at 279-80.  Indeed, "[t]he overall animating purpose behind the Rule is to encourage individuals to request professional assistance by barring litigation against help-seekers." *Wooster Motor Ways, Inc. v. Gonterman*, 701 S.W.3d 511, 517 (Ky. 2024).  As the Firefighter's Rule is, at its core, based on public policy considerations it seems readily applicable to a scenario such as this.  *See Fletcher v. Ill. Cent. Gulf R.R. Co.*, 679 S.W.2d 240, 243 (Ky. Ct. App. 1984) ("[T]he fact that [Appellant] was not injured on appellee's property is of no significance" because Kentucky's Firefighter's Rule is "based on public policy considerations.")  CSX effectively occupied the land covered in tracks but was at least similarly situated for nearby areas because society needs train operators to "call upon the appropriate public protection agency" in the event of derailment.  That the Plaintiffs may have been injured some distance away by fumes is of little importance as "the important elements are some direct connection to the hazard or the site of the hazard and/or the act of requesting assistance." *Gonterman*, 701 S.W.3d at 517.  By their own admission the Plaintiffs responded to the site of the hazard to fight the chemical fires and prevent locals from "encountering a dangerous situation."  [R. 1-2 at 6; R. 16-1 at 13.]

As to the third prong, the Plaintiffs were injured as a result of the specific risk they were called to confront.  In the Complaint the Plaintiffs are effectively described as firefighters who worked to extinguish the chemical fires, a situation that would readily satisfy the third prong.  In their Response they attempt to walk back that position, focusing instead on their role as police officers aiding in crowd control and the like.  While the Court looks only to the Complaint itself,

such a pivot is also unavailing. *Fletcher* is again instructive.[3] In *Fletcher*, the Kentucky Court of Appeals dealt with a claim by a state trooper who inhaled toxic fumes following a train derailment and his ensuing work assisting residents in evacuating. *Fletcher*, 679 S.W.2d at 242. The *Fletcher* court rejected those claims in part because "[a]s a police officer, appellant was expected to assist in the evacuation of the residents of Muldraugh who were threatened by toxic fumes escaping from appellee's tank cars and to be on duty in the dangerous area to prevent other persons from entering it." *Id*. at 243. Thus "by accepting employment as a police officer [appellant] must be deemed to have assumed the personal risk inherent in dealing with the emergency which necessitated his presence." *Id*. Whether or not the Plaintiffs were trained to put out fires or appropriately equipped, they were injured because they were called to aid with a train derailment and to protect the public from the resulting consequences – in other words, their "injury was a result of the risk that [they were] called upon to engage." *Norfolk S. Ry. Co. v. Johnson*, 554 S.W.3d 315, 318 (Ky. 2018).

Plaintiffs suggest that the Firefighter's Rule is inapplicable in this case because they allege that CSX intentionally mislead responders by telling them the railroad cars "were carrying substances that were food grade." [R. 1-2 at 6; 16-1 at 13.] They suggest that the Firefighter's Rule applies only to negligent conduct and not harms "resulting from gross negligence, or reckless or intentional conduct." [R. 16-1 at 13.] The Court agrees. While Kentucky law in this area is underdeveloped, Kentucky courts have refused to apply the Firefighter's Rule to harm resulting from negligence greater than ordinary negligence. *Pedigo v. Raley*, No. 18-CI-000529,

---

[3] Contrary to the Plaintiffs' assertions there is no indication that *Fletcher* is bad law. While it was decided before the more modern formulation of Kentucky's Firefighter's Rule articulated in *Sallee*, it fits comfortably within that framework. Furthermore, *Fletcher* continues to be cited on this issue, suggesting it is not a dead precedent ignored by Kentucky courts. *See Norfolk S. Ry. Co. v. Johnson*, 554 S.W.3d 315, 317-318 (Ky. 2018).

2019 WL 13252597 at *2-3 (Ky. Cir. Ct. May 21, 2019) (Bisig, J.).  As discussed in greater detail below, *see infra* Section II.C.3, the Plaintiffs have plausibly pleaded a claim for willful and wanton negligence due to CSX's initial misleading statement that the cars contained only food grade substances.  Such a misrepresentation may have exposed the Plaintiffs to significant and avoidable danger, a departure from the facts of *Fletcher* (which would otherwise control here) and from the policy considerations underlying the Firefighter's Rule more generally.  While the Plaintiffs' negligence claim is barred by the Firefighter's Rule and will be dismissed, their willful and wanton conduct claim is not thus barred and may proceed.

**B**

Count I of the Plaintiffs' Complaint asserts as its cause of action "Medical Monitoring." [R. 1-2 at 14-16.]  In its Motion to Dismiss CSX argues that medical monitoring is not a valid cause of action in Kentucky and that the Plaintiffs do not allege actionable injuries – either personal or to property.  [R. 11-1 at 15-19.]  In response the Plaintiffs contend that medical monitoring is an accepted prospective remedy in Kentucky and that they properly allege injuries connected to their exposure to sulfur dioxide.[4]  [R. 16-1 at 21-24.]

**1**

The Court first turns to the Plaintiffs' medical monitoring claim in the abstract.  In a sense, CSX is correct that Kentucky does not recognize a cause of action for medical monitoring. *See Wood v. Wyeth-Ayerst Lab'ys, Div. of Am. Home Prods.*, 82 S.W.3d 849, 856-59 (Ky. 2002). Examining various policy considerations, the Kentucky Supreme Court rejected creating such a

---

[4] CSX correctly points out that the Plaintiffs do not address CSX's arguments concerning alleged injuries to property.  [R. 17 at 17.]  Nor could the Plaintiffs meaningfully address that argument as their Complaint contains no factual allegations to support any claim for damages to property.  Unlike some cases involving residents and toxic waste released following train derailments, the Plaintiffs here were merely emergency personnel responding to the scene of the incident – no property of theirs therefore appears to be implicated by the events and they offer no allegations to suggest otherwise.

7

cause of action "having weighed the few potential benefits against the many almost-certain problems of medical monitoring." *Id*. at 859. This Court previously examined the issue of whether Kentucky permits a cause of action for medical monitoring in *Modern Holdings, LLC v. Corning Inc.*, 2015 WL 1481457 at *16 (E.D. Ky. Mar. 31, 2015), and similarly rejected such a cause of action.  However, consistent with the reasoning of *Wood*, the *Modern Holding* decision noted that "Kentucky allows recovery of future medical monitoring costs as a potential form of remedy for plaintiffs with physical injury in an underlying cause of action."  *Id*.  The Plaintiffs here may thus seek medical monitoring as part of the remedy of one of their other causes of action, even if it cannot stand on its own.  *See Modern Holdings*, 2015 WL 1481457 at *16 ("The remedy of prospective medical monitoring may, however, be raised at the appropriate time as this case progresses.")

### 2

CSX also suggests that the Plaintiffs do not allege actionable personal injuries. In its view, the Plaintiffs present with "vague symptoms not plausibly or medically tied to any Plaintiff's sulfur or sulfur dioxide exposure" and cannot rely on their exposure to sulfur dioxide and subsequent fear of that exposure to sustain their claims.  [R. 11-1 at 16-19.]  The Plaintiffs reject this characterization, focus on the unique nature of some of their alleged symptoms and the explicit connection made in their complaint between those symptoms and sulfur dioxide exposure.  [R. 16-1 at 23-24.]

At this stage the Court "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012).  And here the Plaintiffs have adequately tied their symptoms to sulfur dioxide exposure enough to avoid dismissal at least at this stage.  CSX cites *Am. Rolling Mill Co. v. Pack*, 278 Ky.

175, 128 S.W.2d 187, 192 (1939) and *Cincinnati, N. O. & T. P. Ry. Co. v. Nelson*, 299 Ky. 19, 25, 184 S.W.2d 108, 111 (1944) in support of their position but the limited relevance of these cases reveals the weakness of that position. *Pack* was a worker's compensation case reversing the judgment of an administrative board, while *Nelson* was a case reversing a jury verdict – in other words the "vagueness" of the plaintiffs' claims in those cases involved consideration of actual evidence, not just allegations.

Here, despite its formulaic nature, the Complaint alleges that each Plaintiff suffers from "a sore throat, trouble breathing, headaches, and a respiratory infection" and "lives with ongoing pulmonary irritation." [R. 1-2 at 11-13.] Furthermore, the Complaint alleges that each Plaintiff "sought medical treatment and [were] advised [their] symptoms were consistent with sulfur dioxide exposure." *Id*. The Plaintiffs further allege that sulfur dioxide exposure "causes irritation of mucous membranes, throat, esophagus, and eyes; reflex cough; increase in respiratory rate associated with decrease in depth of respiration; decrease in nasal mucus flow; variable effects on tracheal and bronchial mucus flow; decrease in forced expiratory volume and flow; decrease in airway conductance; and increase in airway resistance." *Id*. at 6. These allegations tie the symptoms to the Plaintiffs' exposure to sulfur dioxide following the derailment and present a plausible injury at this stage. Dismissal for the reasons argued here by CSX would therefore be premature.

## C

CSX also substantively attacks the viability of the remaining three Counts of the Complaint –ultrahazardous activities, negligence, and willful and wanton conduct. [R. 11-1 at 19-25.] CSX further contends that the Complaint does not state a viable plea for punitive damages. *Id*. at 24-25. The Court will consider each of these assertions in turn, focusing on

Kentucky law and considering arguments on preemption in due course.

### 1

Count II of the Complaint asserts an ultrahazardous activities claim. [R. 1-2 at 16.] The Plaintiffs assert that "[t]ransportation of highly toxic and combustible carcinogens" is "abnormally dangerous" and "cannot be made safe by the exercise of due care." *Id*. Under Kentucky law an activity is ultra-hazardous if "the very operation itself is, and is known and recognized to be, inherently dangerous at its inception." *Randall v. Shelton,* 293 S.W.2d 559, 561 (Ky. 1956). Kentucky has almost exclusively applied strict liability for ultra-hazardous activities to blasting. *Stathers v. Garrard Cnty. Bd. of Educ.,* 405 S.W.3d 473, 479 (Ky. Ct. App. 2012); *Island Creek Coal Co. v. Rodgers,* 644 S.W.2d 339, 348 (Ky. Ct. App. 1982); *Wolf Creek Collieries Co. v. Davis,* 441 S.W.2d 401, 403 (Ky. 1969).

This Court, and others, have rejected attempts to expand Kentucky's strict liability doctrine to the context of toxic chemicals. In *Modern Holdings* this Court determined that Kentucky courts would likely not treat the usage of toxic chemicals (and thus their storage or transport) as an ultrahazardous activity. *Modern Holdings*, 2015 WL 1481457 at *7-10. This is because the risks associated with toxic chemicals can be addressed with due care. *Id*. at *8 ("the ability to reduce or avoid a hazard with due care" heavily factors into the strict liability analysis because it "distinguish[es] matters suited for strict liability from those better addressed by common law negligence."); *see also Dickens v. Oxy Vinyls, LP*, 631 F. Supp. 2d 859, 864 (W.D. Ky. 2009) ("[N]o ultrahazardous activity at issue" in release of polyvinyl chloride that allegedly released noxious odors and particulates into the air.) Similarly, the Sixth Circuit affirmed a lower court's conclusion that Kentucky courts would not apply a strict liability standard to a gas station's storage of gasoline in underground storage tanks, which had leaked and contaminated

soil on the plaintiff's land.  *Hahn v. Chevron, U.S.A., Inc.*, 60 F.3d 828 (6th Cir. 1995) ("Kentucky courts have declined to extend the strict liability doctrine to seemingly hazardous activity that can be conducted safely.")

Even if the Plaintiffs' ultrahazardous activities claim could proceed based on the toxic chemicals at issue in this case, Kentucky law does not recognize a strict liability cause of action for ultrahazardous activities "performed pursuant to a public service or public necessity." *Johnson v. CSX Transp., Inc.*, 2008 WL 4427211, at *2 (W.D. Ky. Sept. 25, 2008) (citing *Ky. Utils. Co. v. Auto Crane Co.*, 674 S.W.2d 15 (Ky. Ct. App. 1983)); *see also Collins v. Liquid Transporters*, 262 S.W.2d 382 (Ky. 1953) (transportation of gasoline by tanker on public highways was not an ultrahazardous activity).  As a common carrier, CSX has a legal obligation to transport hazardous materials.  *See* 49 U.S.C. § 11101 ("A rail carrier providing transportation or service … shall provide the transportation or service on reasonable request."); *Akron, Canton & Youngstown R.R. Co. v. I.C.C.*, 611 F.2d 1162, 1168-69 (6th Cir. 1979).  It therefore falls within Kentucky's public function exception.  Accordingly, dismissal is appropriate as to Count Two – Ultrahazardous Activities – of the Plaintiffs' Complaint.[5]

**2**

Count III of the Plaintiffs' Complaint brings a claim for negligence.  [R. 1-2 at 17-18.] CSX argues that the Plaintiffs have failed to establish that a duty was owed, lack factual allegations supporting any breach, and fail to allege causation or a compensable injury.  [R. 11-1 at 19-20.]  The Plaintiffs respond by emphasizing Kentucky's "universal" duty of care and note

---

[5] In their Response the Plaintiffs suggest they also asserted that CSX "intentionally dumped molten sulfur and allowed additional off gassing from breached railcars."  [R. 16-1 at 29.]  While this would still not disturb the Court's overall conclusion as to whether activities surrounding toxic chemicals would be treated as ultrahazardous by Kentucky courts, the Court feels compelled to note that these allegations are not present in the Complaint.  The Court looks only to the facts alleged in the Complaint in assessing CSX's motion to dismiss.  *See supra* note 1.

multiple ways they alleged breaches of that duty.  [R. 16-1 at 24-27.]  They also reiterate the various injuries they have alleged and how their allegations tie those injuries to the derailment. *Id*.  Under Kentucky law, a claim for negligence requires a plaintiff to show "(1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty of care; (3) a causal connection between the defendant's conduct and the plaintiff[']s damages; and (4) damages." *Gonzalez v. Johnson*, 581 S.W.3d 529, 532 (Ky. 2019).

Kentucky has adopted "a 'universal duty of care' which requires every person to exercise ordinary care in his activities to prevent foreseeable injury."  *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006) ("Ordinary care is the same degree of care as a prudent person engaged in a similar or like business would exercise under the circumstances.") (citing *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell,* 736 S.W.2d 328 (Ky. 1987)).  Nevertheless, "the 'universal duty of care' is not boundless" and "consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation."  *Id.* at 531.  In assessing duty, Kentucky courts routinely focus on whether harm was foreseeable.  *Hicks ex rel. Hicks*, 189 S.W.3d at 531; *Bramlett v. Ryan*, 635 S.W.3d 831, 839 (Ky. 2021); *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003) ("The most important factor in determining whether a duty exists is foreseeability.").  Far from creating "an extension of Kentucky negligence doctrine," as CSX contends, the Plaintiffs' claims fall squarely within it.  CSX was under a duty to act with ordinary care in preventing reasonable harm, just like everyone else.  Train derailments, and the subsequent leak of toxic chemicals carried by the train cars, are a natural and foreseeable risk of running a railroad.

The Plaintiffs also plausibly assert that CSX breached that duty.  They cite numerous federal regulations that CSX allegedly failed to follow, explain the cause of the derailment (a

wheel bearing failure), and explain how CSX failed to monitor and inspect wheel bearings by utilizing an insufficient number of hot bearing detectors (HBDs) which would "alarm crews of faulty wheel bearings."  [R. 1-2 at 6-11.]  The Plaintiffs offer further facts explaining how those HBDs are normally spaced and how the manner in which they were placed here violates industry best practices.  *Id.* at 8.  The Plaintiff's Complaint is admittedly not as robust as might be hoped, but it does provide CSX with sufficient information and "fair notice concerning the nature of the claim and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. And, as the Court has addressed previously, *see supra* Section II.B.2, the Plaintiffs adequately allege injuries and connect those injuries to the derailment and consequent release of sulfur dioxide.  The Plaintiffs therefore sufficiently state their negligence claim.

### 3

Count IV of the Plaintiffs' Complaint is a claim for "Willful & Wanton Conduct."  [R. 1-2 at 18-20.] CSX contends that this count must fail because willful and wanton conduct "is not a distinct cause of action in Kentucky."  [R. 11-1 at 23-24.]  The Plaintiffs do not respond to this argument, instead appearing to argue that their claim for gross negligence should survive.  [R. 16-1 at 27-29.]  The problem with that assertion is that the Plaintiffs made no such gross negligence claim in their Complaint.  Nevertheless, CSX is also incorrect in its reading of the Complaint.

In Kentucky, courts distinguish between ordinary negligence and willful or wanton negligence, which is the cause of action the Court understands Count IV to be.  *See Brotherton v. Victory Sports, Inc.*, 24 F. Supp. 3d 617, 620 (E.D. Ky. 2014).  Indeed the negligence standards of Kentucky operate across a continuum, with ordinary negligence being "the absence of ordinary care," gross negligence being "the absence of slight care," and willful and wanton

negligence being defined as "the entire absence of care for the life, person or property of others" along with "an element of conscious disregard of the rights or safety of others, which deserves extra punishment in tort." *See Donegan v. Beech Bend Raceway Park, Inc*., 894 F.2d 205, 207-08 (6th Cir. 1990) (quoting *Lowe v. Commonwealth,* 298 Ky. 7, 181 S.W.2d 409, 412 (1944) and *McTavish v. Chesapeake & O.R.R.,* 485 F.2d 510, 512 (6th Cir. 1973)); *Cumberland Valley Contractors, Inc. v. Bell Cnty. Coal Corp.,* 238 S.W.3d 644, 655, n. 33 (Ky. 2007). Thus, both parties appear to miss the mark – CSX by arguing that no such standard exists and the Plaintiffs by arguing that they satisfy a lower standard.

Nevertheless, the Court believes that the Plaintiffs have sufficiently pleaded willful or wanton negligence on the part of CSX. In their Complaint, the Plaintiffs allege that "CSX initially told local first responders that there was nothing to worry about, as the cars were carrying substances that were food grade." [R. 1-2 at 6.] To their misfortune, that was untrue. It is of course possible that such misinformation was merely a mistake. But as the Plaintiffs point out in their response, they may also have been "intentionally lied to about the situation." [R. 16-1 at 29.] And if CSX was truthful originally, perhaps the Plaintiffs could have donned protective gear or otherwise mitigated the risks they were exposed to. *Id.* Lying in such a way about such a serious risk could be considered willful or wanton conduct on the part of CSX.[6]

### D

CSX's last argument in favor of dismissal is that the Plaintiffs claims are preempted by federal law, namely three particular federal statutes – the Interstate Commerce Commission

---

[6] CSX also argues that the Plaintiffs do not meet the state common law standard for punitive damages, which requires at least gross negligence. [R. 16-1 at 24-25.]; *See Saint Joseph Healthcare, Inc. v. Thomas,* 487 S.W.3d 864 (Ky. 2016) ("[P]unitive damages may also be awarded under the common law standard of 'gross negligence.'") As the Plaintiffs have plausibly pleaded a claim for wanton and willful negligence – a higher bar than gross negligence – they can persist in seeking punitive damages.

Termination Act, 49 U.S.C. § 10101, *et seq*. (ICCTA), the Federal Railroad Safety Act, 49

U.S.C. § 20101, *et seq*. (FRSA), and the Hazardous Materials Transportation Act, 49 U.S.C. §

5101, *et seq*. (HMTA).  [R. 11-1 at 25-33.]  CSX suggests that these statutes work together in a

comprehensive manner to preempt state law tort claims, including the Plaintiffs'.  In response the

Plaintiffs dispute not only whether these statutes preempt their claims, but also which statute's

particular preemption analysis should apply to the claims at hand.  [R. 16-1 at 13-20.]  In the

Plaintiffs' view, it is solely the FRSA that applies to the claims here and their claims are either

not "substantially subsumed" by regulations under that act or otherwise fit within the FRSA's

saving clause by making allegations that CSX violated applicable federal regulations.  *Id.*  The

Court must therefore first assess which statute (or statutes) applies in the instant case before

conducting further preemption analysis.

**1**

The Sixth Circuit has held that the ICCTA "preempts all state laws that may reasonably

be said to have the effect of managing or governing rail transportation, while permitting the

continued application of laws having a more remote or incidental effect on rail transportation."

*Adrian & Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 539-40 (6th Cir. 2008) (citation

omitted).  However, the Sixth Circuit has also posited that "if a regulation has a connection with

rail safety then the 'FRSA provides the applicable standard for assessing federal preemption.'"

*CSX Transportation, Inc. v. City of Sebree, Kentucky*, 924 F.3d 276, 285 (6th Cir. 2019)

(quoting *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 524 (6th Cir. 2001)).

Courts in this circuit appear to be thoroughly split on the overlap between the ICCTA and

the FRSA.  Some have applied both, even in cases of derailment.  *See Trimbur v. Norfolk S. Ry.*

*Co.*, 2015 WL 4755205, at *5–8 (S.D. Ohio Aug. 10, 2015) (negligence, gross negligence, and

negligence per se claims concerning track inspection and maintenance based on train derailment preempted by ICCTA); *Maynard v. CSX Transp., Inc.*, 360 F.Supp.2d 836, 843 (E.D. Ky. 2004); *Tipton v. CSX Transportation, Inc.*, 2016 WL 11501426 at *7-8 (E.D. Tenn. July 7, 2016) (claims related to negligent design, operation, inspection, maintenance, and repair based on train derailment preempted by ICCTA).  Others have focused solely on the FRSA when the claims involve rail safety.  *See Smith v. CSX Transp., Inc.*, 2014 WL 3732622, at *2 (N.D. Ohio July 25, 2014); *In re E. Palestine Train Derailment*, 2024 WL 1096064, at *7 (N.D. Ohio Mar. 13, 2024). Just recently, Judge Wier, in a case brought over the very derailment at issue in this case and based on similar claims, concluded that the FRSA and not the ICCTA applied when the claims involved rail-safety – even when those same claims touched on "track design or track operation." *Webb v. CSX Transportation, Inc.*, 2025 WL 967149 at *5-6 (E.D. Ky. Mar. 28, 2025).

Ultimately this Court thinks that *Tyrrell* and those cases, such as *Webb*, treating rail safety related claims as falling within the purview of the FRSA have the better view.  Indeed, in *Tyrrell* the Sixth Circuit walked through the interaction between the ICCTA and the FRSA, explaining that the district court's decision there "erroneously preempt[ed] state rail safety law that is saved under FRSA if it tangentially touches upon an economic area regulated under the ICCTA," an impermissible interpretation that would "implicitly repeal[] FRSA's first saving clause."  *Tyrrell*, 248 F.3d at 522-23.  The *Tyrrell* court explained that the ICCTA and FRSA should be construed *in pari materia*, and there was no Congressional intention "for the STB to supplant the FRA's authority over rail safety."  *Id.* at 523.  Thus, because the Plaintiffs' claims here all at least touch upon issues of rail safety, they are better understood as being governed by FRSA preemption and the saving clause that comes alongside.  *See also Island Park, LLC v. CSX Transp., Inc.*, 559 F.3d 96, 107 (2d Cir. 2009) ("Several circuits that have examined the interplay

between [the] ICCTA and FRSA have concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the [FRA], not the STB.... Thus, FRSA provides the appropriate basis for analyzing whether a state law, regulation[,] or order affecting rail safety is pre-empted by federal law.") (citing *Tyrrell*, 248 F.3d at 523.)

CSX has also suggested that the HMTA preempts the Plaintiffs' claims.  [R. 11-1 at 32-33.]  The Plaintiffs response does not address this argument by CSX.  Nevertheless, the Court considers whether preemption under the HMTA is appropriate.  The Sixth Circuit has held that FRSA preemption analysis applies to the HMTA.  *CSX Transp., Inc. v. Pub. Util. Com'n of Ohio*, 901 F.2d 497, 501-02 (6th Cir. 1990).  The *Public Utilities* decision examined the interplay between the statutes and predicated its decision on the understanding that the HMTA was directed at broad concerns involving hazardous materials, of which rail safety is only a subset. *Id.*  By contrast, the FRSA is directly focused on railroad safety.  *Id.*  Lower courts in the Sixth Circuit therefore routinely consider only the FRSA, and its saving clause, for railroad safety related claims that might otherwise also touch upon areas regulated by the HMTA. *See Tipton*, WL 11501426 at *13-15; *Trimbur*, 2015 WL 4755205, at *5; *E. Palestine*, 2024 WL 1096064, at *6; *Webb*, 2025 WL 967149 at *6.  To the extent the HMTA or associated regulations are at issue in this case, the Court will analyze those questions through the same preemption lens as it analyzes CSX's FRSA preemption arguments.

## 2

The FRSA was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents" and authorizes the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety."  *Norfolk S. Ry. Co. v. Shanklin,* 529 U.S. 344, 347 (2000) (quoting 49 U.S.C. §§ 20101, 20103(a)).  Under the

FRSA's express preemption provision, "[l]aws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). However, "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety ... until the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). The Supreme Court has explained that a state-law negligence action is "covered," and therefore preempted, if a FRSA regulation "substantially subsume[s]" the subject matter of the suit. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993). The FRSA's preemption provision was amended in 2007 to make clear that even though it prevents states from imposing obligations in addition to or inconsistent with federal regulations, the FRSA does not preempt claims premised on a defendant's alleged failure to comply with existing federal safety regulations. 49 U.S.C. § 20106(b)(1). Thus, the Court must consider two questions: (1) whether the claim at issue is covered by federal regulation and, if so, (2) whether the plaintiffs plausibly allege violations of a covering regulation. If a claim is either not covered or adequately alleges violations of a covering regulation, it is not preempted.

**a**

The Court first turns to whether the Plaintiffs' claims are covered by relevant regulations. Many are. CSX contends that the Plaintiffs claims involving inspection, training, routing, transport and detectors are all substantially subsumed by some safety regulation. [R. 11-1 at 29-31.] For many of these the Plaintiffs do not contest CSX's assertion, instead focusing on their claim involving "hot bearing detectors."[7] [R. 16-1 at 17-19.] For that claim, CSX identifies 49

---

[7] In fact, the Plaintiffs specifically note that their "remaining claims rest on properly alleged regulatory violations or violations of internal plans, rules, and standards." [R. 16-1 at 19.] The Court takes this to mean the Plaintiffs concede CSX is largely correct on this issue, other than the dispute over hot bearing detectors.

C.F.R § 215.103(h) and 49 C.F.R §215.115 as preempting regulations.  Together these regulations prohibit the use of a railcar in transit if a wheel presents certain indicators of being overheated, such as discoloration, damage to the seal, or distortion of any bearing component. *Id.*  These regulations do not mention hot bearing detectors, which prompts CSX to argue that "Plaintiffs thus seek to impose significant additional requirements—i.e., trackside detectors placed at specific intervals—on CSXT's operations beyond the requirements of the FRSA."  [R. 11-1 at 31.]

The Court disagrees as the Plaintiffs' claims involving hot bearing detectors are not substantially subsumed by 49 C.F.R § 215.103(h) and 49 C.F.R §215.115.  As Judge Wier pointed out in *Webb*, "[a] general duty to implement and maintain some kind of effective method for wheel-bearing monitoring is distinguishable, however, from an alleged duty to properly employ a *specific* method for such monitoring."  *Webb*, 2025 WL 967149 at *8 (emphasis in original).  Touching upon or relating to the same subject matter as a state regulation is not sufficient for the federal regulation to preempt that state standard.  *Tyrrell*, 248 F.3d at 524 (citing *Easterwood*, 507 U.S. at 664.)  Indeed, the FRA (responsible for FRSA regulations) released a recent safety advisory publication where it stated "there are no Federal regulations requiring the use of HBDs for freight trains, or any regulations related to the inspection, calibration, and maintenance of this equipment[.]" *FSA Safety Advisory 2023-01*, 88 Fed. Reg. 13494, 13496 (Mar. 3, 2023).[8] While courts have not spoken with one voice on whether claims

---

[8] The Court notes that CSX has recently filed a motion for reconsideration as to Judge Wier's conclusion on this issue. *Webb v. CSX Transportation, Inc.*, No. 6:23-CV-211-REW-HAI (E.D. Ky.) at R. 47 therein. In that motion, CSX takes issue with Judge Wier's reference to a "specific method," and emphasizes that the focus is on the subject matter purportedly covered.  [*See Webb*, R. 47-1 at 6-10.]  In support CSX relies heavily on *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426 (6th Cir. 2009), which found that a regulation covering ballast installation preempted state law claims, ignoring the plaintiffs' argument that the railroad was negligent for using large instead of small ballasts.  The issue here is really one of generality. On some level all of the regulations discussed address the subject matter of trains and railroad

involving the usage of HBDs are preempted by federal regulations, this Court concludes they are not. *See Webb*, 2025 WL 967149 at *8; *E. Palestine*, 2024 WL 1096064, at *5; *But see Tipton*, WL 11501426 at *10.

**b**

The Court next turns to whether the Plaintiffs have adequately alleged violations of covering federal regulations. *See* 49 U.S.C. § 20106(b)(1). They have not. For many of the regulations CSX is alleged to have breached, the Plaintiffs offer no facts of any kind suggesting how any were violated. As CSX characterizes it, the Complaint is, at parts, merely "reading from the Federal Register." [R. 11-1 at 31-32.] The Plaintiffs' failure to offer facts showing plausible violations of various regulations is fatal to those claims that are covered by those regulations – a group which consists of essentially all their claims other than those involving HBDs. Briefly the Court notes, however, that if it saw HBDs as covered by regulations – thus necessitating a violation of those regulations to avoid preemption – the Plaintiffs would have plausibly alleged such violations here. Unlike with many of their claims, the Plaintiffs offer specific facts about how the derailment occurred, the derailment's connection to overheated wheel bearings, CSX's failure to properly utilize HBDs, and how that failure contributed to the disaster.[9] [R. 1-2 at 2-4, 7-8.]

---

safety – yet that does not preempt any and every claim brushing up against that same subject matter. The inquiry is thus narrower. *Nickels* therefore seems inapposite to what is occurring in this case, with the regulations at issue here rather broadly prescribing duties to inspect wheel bearings. *Nickels* would be a more apt comparison if the allegations concerned the type or implementation of HBDs (assuming they were required by regulation), rather than their usage at all.

[9] The Court also does not touch on the Plaintiffs' allegation that CSX lied to or mislead responders about the nature of what was carried by the derailed train cars as CSX has made no reference to it in their motion or offered a regulation that may cover such behavior. *See Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 674-75 (6th Cir. 2013) ("Federal preemption is an affirmative defense that requires the defendant ... to prove that ... federal preemption applies.") However, as the pleadings stand it seems likely that, were such a regulation identified, the Plaintiffs would have undoubtedly pleaded plausible violations of it based on the very nature of their allegations.

**III**

The Plaintiffs have brought a number of claims against Defendant CSX Transportation, but, for sundry reasons, many of those claims fail.  On the issue of preemption, the Plaintiffs' claims survive based only on their allegations surrounding the usage of HBDS – not their laundry list of other regulations, unmoored from any facts, which CSX purportedly violated. State law presents yet another barrier to those claims that survive.  First, Kentucky recognizes medical monitoring only as a potential remedy, not as a cause of action in itself.  Second, Kentucky would not recognize the Plaintiffs' ultrahazardous activities claim based on these facts. Finally, the Firefighter's Rule acts to prevent the Plaintiffs' negligence claims from proceeding, based on their status as first responders responding to the scene of an incident.  Nevertheless, the Plaintiffs may proceed on their willful and wanton negligence claim, grounded in their allegation that CSX lied or mislead first responders about the risks they faced.  Medical monitoring and punitive damages persist as potential remedies to that claim.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that:

1.   Defendant CSX Transportation's Motion to Dismiss **[R. 11]** is **GRANTED in part** and **DENIED in part** as follows:

   a.   Count One of the Plaintiffs' Complaint – Medical Monitoring – will be **DISMISSED**;

   b.   Count Two of the Plaintiffs' Complaint – Ultrahazardous Activities – will be **DISMISSED**;

   c.   Count Three of the Plaintiffs' Complaint – Negligence – will be **DISMISSED**; and

    d.  Count Four of the Plaintiffs' Complaint – Willful and Wanton Conduct – will remain pending before the Court.

This the 16th day of June, 2025.

Gregory F. Van Tatenhove
United States District Judge